UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
••••••••••••••••••••••••••••••••••••••••••••••••••••••••••X

RONNIE COVINGTON,                              :

               Petitioner,              :

      - against -                              :

WARDEN, FIVE POINTS                            :
CORRECTIONAL FACILITY,

                    :

             Respondent.
---------------------------------------------------------x

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 12/8/14

**REPORT AND**
**RECOMMENDATION**
**TO THE HONORABLE**
**ANALISA TORRES**

11cv8761-AT-FM

**FRANK MAAS**, United States Magistrate Judge.

       Pro se petitioner Ronnie Covington ("Covington") brings this habeas corpus

proceeding, pursuant to 28 U.S.C. § 2254 ("Section 2254"), to challenge his conviction,

following a jury trial in Supreme Court, New York County, on two counts of Robbery in

the Second Degree, six counts of Criminal Usury in the First Degree, three counts of

Criminal Use of Public Benefit Cards in the Second Degree, one count of Criminal

Possession of Public Benefit Cards in the Third Degree, and one count of Assault in the

Third Degree. On July 6, 2004, Justice Richard D. Carruthers, before whom the case was

tried, sentenced Covington, as a second felony offender, to prison terms which, in the

aggregate, amount to a sentence of twenty-two and one-half to thirty years.

       In his petition, which spans nearly three hundred pages (exclusive of

exhibits), Covington appears to press seven claims previously asserted as part of his direct

appeal. (See ECF No. 1 ("Petition" or "Pet.")). These include allegations that:

    (1)     The pretrial suppression hearing determinations were erroneous;

    (2)     The grand jury proceeding resulting in Covington's indictment was defective;

    (3)     Covington's conviction on the charge of Criminal Possession of Public Benefit Cards in the Third Degree was obtained unconstitutionally;

    (4)     Covington was prejudiced by prosecutorial misconduct;

    (5)     Covington was prejudiced by juror misconduct;

    (6)     Covington's trial counsel was ineffective; and

    (7)     Covington was resentenced improperly.

For the reasons set forth below, Covington's Petition should be denied. Additionally, because Covington has not made the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2), a certificate of appealability should not issue.

I.    <u>Background</u>

    A.    <u>Trial</u>

        1.    <u>People's Case</u>

The case against Covington arose out of a scheme to make short-term usurious loans secured by possession of the borrowers' public benefit cards. Several recalcitrant borrowers also were subjected to violence. The evidence at trial with respect

to the loan sharking scheme and this violence would have permitted a reasonable juror to find as follows:

Between December 2002 and August 2003, Covington made a series of usurious loans to Karen Green ("Green"), Anthony Faison ("Faison"), Karen White ("White"), Joseph Vinson ("Vinson"), and Donald Williams ("Williams").  (See Tr. 174-99, 226-99, 303-27, 349-62, 439-54).[1]  Covington typically required that these loans be repaid within one or two weeks, with one hundred percent interest, resulting in repayment by the debtors of twice the principal amount of each loan.  As security, the debtors would provide Covington with their New York public benefit cards, which Covington would keep as collateral until the loans were repaid.  At times, the debtors also would provide Covington with the personal identification numbers ("PINs") associated with their public benefit accounts.  Telephone records confirmed that Covington and Barbara Brundage ("Brundage"), his fiancée, made repeated calls from their cell phones to a New York State benefits "helpline."  Through the helpline, they were able to check the balances on the accounts of public benefit recipients, but could only obtain information about one account per call.  (Id. at 108-09, 161-73, 459-60).

---

[1]      "H1.," "H2.," and "H3.," refer, respectively, to the transcripts of the pretrial proceedings conducted on March 2-3, April 20, and April 27, 2004.  (ECF No. 17  (Decl. Of Ass't Att'y Gen. Leilani Rodriguez, dated April 30, 2012 ("Rodriguez Decl." or "Rodriguez Declaration"), Ex. 20 at 1-213).  "Tr." refers to the trial transcript.  (Rodriguez Decl Exs. 20-22).  "S." refers to the sentencing minutes.  (Rodriguez Decl. Ex. 22 at 333-349).  "Ex." refers to the exhibits annexed to the Rodriguez Declaration.  "Pet'r's Ex." refers to the exhibits submitted by Covington as part of his Petition.

3

In the course of his loansharking business, Covington resorted to violence at least twice.  The first such incident involved Faison, who had taken a loan of approximately $300 in early May 2003.  (Id. at 235-36).  Faison repaid a portion of the loan to Brundage, but was unable to make repayment in full.  (Id. at 239).  Subsequently, after Brundage summoned Covington to the site of the partial repayment, Covington struck Faison, who ran away.  (Id.).  Several days later, Covington and a "young man" went to Faison's residence, where they both attacked Faison, and Covington struck him with a television set.  (Id. at 240-41).

The second act of violence took place on the evening of August 22, 2003. On that occasion, Covington, and a man whom he referred to as his "son," approached John Vest ("Vest") while he was sitting on a park bench on the Broadway median at 109th Street in Manhattan.  (Id. at 119-20, 135).  When the other man asked Vest if he needed any money, Vest indicated that he did not.  (Id. at 120-21).  Asserting that Vest owed Covington and him money, the man "smac[k]ed" Vest, and the two became involved in a physical altercation.  (Id. at 121-22).  Covington then joined the fray.  (Id. at 122).  During the incident, one of the men took Vest's wallet, the contents of which included his public benefit card and approximately forty dollars in cash.  (Id. at 122-24). Covington's "son," claiming that Vest now owed him money because his neck chain had been broken during the altercation, demanded the PIN for the benefit card he had removed from Vest's wallet.  Vest, however, provided an incorrect PIN.  (Id. at 124). The men released Vest, but as he was walking home attacked him again, knocking him

4

down and kicking him repeatedly.  (Id. at 126-27).  Vest was hospitalized for several days as a consequence of the attack.  (Id. at 128).

In addition to Faison and Vest, the People called White, Green, and Vinson, to testify.  Each of the witnesses testified to essentially the same usurious lending practices on the part of Covington.  (See Tr. 174-99, 226-99, 303-27, 349-62, 439-54).

On August 26, 2003, Covington entered the New York City Police Department's 24th Precinct to inquire whether a friend of his who had been arrested had been brought there.  (Id. at 366).  Police Officer Schmidt ("P.O. Schmidt"), the officer on duty, recognized Covington from "wanted" posters at the precinct that related to the Vest assault.  (Id. at 368, 370, 392).  P.O. Schmidt placed Covington under arrest after he responded to the name "Ronnie."  (Id. at 371-72).  During a subsequent search of Covington's person, P.O. Schmidt recovered a cell phone and six public benefit cards, only one of which belonged to Covington.  (Id. at 373-74, 376).

Prior to his indictment, Covington appeared voluntarily before a grand jury. During his grand jury testimony, which was read to the trial jury by the prosecutor, (see id. at 215), Covington contended that he had not gone to the precinct out of concern for a friend, but, rather, because Brundage and White had informed him that the police were looking for him.  (Ex. I at 27).[2]  According to Covington, at the time, he had two

---

[2]     The record does not include a transcript of the grand jury testimony read to the trial jury.  (See ECF No. 16 (Respondent's Memorandum of Law ("Resp't's Mem.") at 13 n.11)).  Nevertheless, the statements that Covington made to the grand jury are summarized in the People's brief in opposition to Covington's direct appeal.  (See Ex. I at 27-28).

public benefit cards belonging to Green and White because Brundage had asked him to

return the cards to them.  (Id.).  Covington further testified that, on the way to the precinct

he found three more public benefit cards on the ground, which he retrieved so that he

could bring them to the precinct.  As he explained, he was arrested before he had an

opportunity to tender these cards to the police.  (Id. at 27-28).  Covington also denied

committing any robberies, explaining to the grand jurors that on August 22, 2003, the day

Vest was attacked, he spent the entire day in the Bronx with Brundage and two other

individuals.  (Id. at 28).

2.    Defense Case

Covington called two witnesses to testify on his behalf.  The first witness,

Umit Singh Dhuga, a Ph.D. candidate at Columbia University, witnessed the attack on

Vest.  (Tr. 467-69).  Prior to testifying, Dhuga advised Covington's defense counsel,

Scott L. Fenstermaker, Esq. ("Mr. Fenstermaker"), that he saw only one attacker, a man

whom he could not identify.  (Id. at 500).  Further, Mr. Fenstermaker was aware that

Dhuga had viewed only one lineup, during which he had failed to identify Covington.

(Id. at 503).  Although Dhuga was thus in a position to contradict Vest's assertion that

there were two attackers, i.e., Covington and his "son," Dhuga also had made plain to

counsel that he had "racist inclinations against . . . [b]ack people who commit crimes,"

and that he believed that Covington should be incarcerated regardless of whether he could

be identified as the attacker in Vest's attack.  Dhuga allegedly formed this opinion

because "he had been told . . . by one of the detectives investigating the matter, that Mr.

Covington had a criminal history." (Id. at 501). Notwithstanding Dhuga's possible prejudice, Covington apparently agreed with Mr. Fenstermaker that Dhuga's potential testimony regarding a single unidentified attacker made calling him as a witness an acceptable risk. (See id. at 429, 501-503).

Once on the stand, Dhuga conceded that he had seen only one attacker, but went on to claim falsely that he had identified Covington during the second of two lineups that he had observed. (Id. at 469-72). During subsequent colloquy, the prosecutor explained to Justice Carruthers that Dhuga had indeed viewed two lineups, only one of which included Covington, and that Dhuga had failed to identify Covington during the lineup in which he actually appeared. (Id. at 496-99). Ultimately, Justice Carruthers decided to strike Dhuga's testimony, and gave the jurors a curative instruction indicating that they were to disregard that testimony and draw no inferences from it. (Id. at 556-57).

The second defense witness was Dr. Robert Bonillas ("Dr. Bonillas"), a fourth-year surgical resident at Saint Luke's-Roosevelt Hospital in Manhattan, who had examined Vest on the morning of August 23, 2003. (See id. at 558-72). Dr. Bonillas testified that, in response to his questions, Vest had explained that he was assaulted but "did not know at that time" who had assaulted him. (Id. at 564).

### 3. Verdict and Sentencing

On May 6, 2004, the jury found Covington guilty of two counts of Robbery in the Second Degree and one count of Assault in the Third Degree related to the Vest

assault; three counts of Criminal Use of a Public Benefit Card in the Second Degree, two
of which related to White and one of which related to Vinson; and one count of Criminal
Possession of Public Benefit Cards in the Third Degree, arising out of the five public
benefit cards in Covington's possession at the time of his arrest.  (Id. at 755-59).
Additionally, the jury found Covington guilty of a total of six counts of Criminal Usury in
the First Degree.  One of those usury counts related to Faison, two related to Vinson, one
related to White, and two related to Green.  (Id.).

On July 6, 2004, Justice Carruthers sentenced Covington, as a second
felony offender, to concurrent determinate terms of fifteen years on the assault and
robbery counts.  (S. 7, 16).  On both criminal usury counts, Justice Carruthers sentenced
Covington to concurrent indeterminate terms of seven and one-half to fifteen years, to run
consecutively to the terms of imprisonment on the robbery and assault counts, but
concurrently with indeterminate terms of two to four years on the possession of public
benefit cards count and determinate one-year terms on each of the criminal use of public
benefit cards counts.  (Id. at 17).

B.    Pretrial Proceedings

Prior to trial, on March 2, 2004, Justice John Bradley held a combined
Wade, Mapp, Huntley, and Dunaway hearing.  (See H1. 1-139).

P.O. Schmidt testified that he was on duty the night of August 26, 2003,
when Covington entered the 24th Precinct.  (Id. at 7).  After recognizing Covington as the
person depicted in the precinct "wanted" poster, P.O. Schmidt addressed Covington by

the name indicated on the poster.  (Id. at 8-11).  When Covington appeared to respond affirmatively, P.O. Schmidt placed him under arrest.  (Id. at 12).  Following the arrest, P.O. Schmidt emptied Covington's pockets, finding a cell phone and six public benefit cards, only one of which belonged to Covington.  (Id. at 12-13, 19, 21).

Parole Officer Ruben Hernandez ("Hernandez") testified that Covington was reporting to him weekly at the time of his August 2003 arrest.  (Id. at 27).  During a scheduled appointment on September 8, 2003, Covington reported to Hernandez that he had been arrested on August 26, 2003).  (Id.).  Covington further recounted that on the night of August 25th, 2013, he had left his apartment in Brooklyn at approximately 1 a.m., thereby violating his parole conditions, to go to a police precinct after his "girlfriend" received a telephone call from White, who indicated that the police were looking for him.  (Id. at 27-28).  Subsequently, after being placed in custody because of the admitted curfew violation, but before he had been read his Miranda rights, Covington told Hernandez that a friend who either had been arrested or was being questioned needed his assistance at the precinct.  (Id. at 30, 34-36).

Detective Errol Santos ("Det. Santos"), the detective assigned to investigate the assault on Vest, testified that he showed photo arrays containing a photograph of Covington to Vest and Melvin Glass ("Glass"), a witness to Vest's assault who did not testify at trial.  Det. Santos also conducted two lineups for Vest and Glass in which Covington participated.  (Id. at 42-56).  Vest and Glass both identified Covington as

Vest's assailant in response to the photo arrays and lineups.  (Id.).  Subsequently, Faison

also identified Covington as his assailant after viewing a photo array.  (Id. at 59-60).[3]

Based on this testimony, Justice Bradley suppressed Covington's post-arrest

statement to Hernandez, but denied the application to suppress the public benefit cards

and cell phone seized from his person by P.O. Schmidt.  Justice Bradley further found

that the photographic and lineup identification procedures were not unduly suggestive.

(Id. at 135).

C.     Applications for New Counsel

During a pretrial conference before Justice Renee White on April 20, 2004,

Mr. Fenstermaker indicated that Covington wished to have the court appoint new counsel

because Mr. Fenstermaker's wife was an assistant district attorney.  (H2. 2).  When the

Justice inquired, however, Covington did not pursue this request, opting instead to discuss

a possible severance of certain charges and a renewed application for bail.  (H2. 2-5).

Justice White responded that Mr. Fenstermaker was giving Covington "good legal

advice" and that the claims he sought to pursue could not be granted.  (Id. at 3, 5).

Thereafter, following the prosecutor's opening statement at trial, Mr.

Fenstermaker made a further application to withdraw, this time joining in Covington's

---

[3]     Additionally, Detective Anderson Walcott ("Det. Walcott") testified that after
receiving a complaint that Williams had been assaulted by an individual named "Ronnie," he
showed Williams a photo array containing Covington's photograph and also conducted a lineup
in which Covington participated.  (Id. at 100-05).  Williams identified Covington both times.
(Id. at 103-04).  As explained below, however, the charges against Covington relating to
Williams were dropped during the trial.  See infra at 28-29.

10

request for that relief.  (Tr. 64).  With the consent of the prosecutor, Mr. Fenstermaker provided additional information to Justice Carruthers ex parte, explaining that he and Covington disagreed as to trial strategy.  (Id. at 73-75).  Specifically, Mr. Fenstermaker wished to concede Covington's guilt on several of the usury charges but vigorously challenge the robbery and assault charges; Covington, on the other hand, preferred that Mr. Fenstermaker waive his opening statement and hear the People's evidence before conceding guilt as to any charge.  (Id. at 73-74, 79-80).  Covington also repeated his belief that Mr. Fenstermaker was laboring under a conflict of interest because his wife was an assistant district attorney, and noted that he had recently discovered that Mr. Fenstermaker also was a former assistant district attorney.  (Id. at 79).

After extensive discussion with both Mr. Fenstermaker and Covington, (id. at 64-99), Justice Carruthers stated that:

> [T]he overall strategic decision in how to proceed, the tactical decisions, and what witnesses to call, what questions to ask the witnesses, belongs to defense counsel.
>
> The defendant, though, has some very clear rights that transcend[] all.  One of those rights is the right to testify, to make a decision to either testify or not testify.  That belongs with the defendant personally. He should be open to what counsel says, but that decision belongs to the defendant.
>
> The defendant also has the inalienable right to make the decision of whether to plead guilty or to plead not guilty in a criminal case.  That belongs with the defendant.

(Id. at 96).  In keeping with these precepts, the Justice instructed Mr. Fenstermaker not to concede Covington's guilt on any charge unless Covington agreed.  (Id. at 96, 99).  The

Justice further commented that, despite this "bump in the road," he was "convinced" that the relationship between Mr. Fenstermaker and Covington was "repairable," and that he was "fully confident that th[e] case [could] go forward." (Id. at 99). Shortly thereafter, complying with Covington's wishes, Mr. Fenstermaker waived his opening statement. (Id. at 101-02).

        D.     <u>Post-Trial Proceedings</u>

            1.     <u>Motion to Set Aside the Verdict</u>

        Prior to sentencing, on May 19, 2004, Mr. Fenstermaker filed a motion to set aside the verdict pursuant to Section 330.30 of the New York Criminal Procedure Law ("CPL"). (See Ex. I at 60). As part of that motion, Mr. Fenstermaker affirmed that he recently had learned that, while Covington's trial was underway, a Legal Aid Society attorney overheard several jurors disparaging one of the trial witnesses. (Id.). According to Mr. Fenstermaker, the Legal Aid Attorney believed that she had overheard these remarks on May 5, 2004, at about 11 a.m. (Id.). Mr. Fenstermaker further represented that the jurors must have been discussing Covington's case because they mentioned Mr. Fenstermaker by name. (Id.). Nevertheless, Mr. Fenstermaker did not submit a sworn statement by the Legal Aid Attorney as part of his motion. A second branch of the motion evidently sought relief based on the Dhuga episode at trial. (See Ex. D at 2).[4] Immediately before the sentencing, Justice Carruthers orally denied both aspects of the motion. (Ex. I at 60).

-------------------------------------------------------------------

[4]     The papers relating to the motion are not part of the record before the Court.

2.      <u>Motion to Vacate Judgment and Set Aside Sentence</u>

On August 12, 2004, Mr. Fenstermaker moved to vacate the judgment of conviction pursuant to CPL §§ 440.10 and 440.30, and to set aside the sentence pursuant to CPL § 440.20.  (<u>See</u> Ex. A).  In moving to set aside the sentence, Covington contended that the consecutive sentences imposed by Justice Carruthers violated the Supreme Court's decision in <u>Blakely v. Washington</u>, 542 U.S. 296 (2004).  (Ex. A at 2-7).  In <u>Blakely</u>, the Supreme Court held that any facts that could lead to a sentence exceeding a prescribed range either had to be admitted by the defendant or found by a jury.  <u>Blakely</u>, 542 U.S. at 302-306.  In moving to vacate the judgment, Covington claimed that he had been irretrievably prejudiced by Dhuga's false testimony.  (Ex. A at 2-7).

By decision and order dated September 23, 2004, Justice Carruthers denied Covington's motion "in all respects."  (Ex. D at 1).  The Justice concluded that <u>Blakely</u> was inapposite because the "jury's verdict convicted [Covington] of various separate crimes, committed at separate times."  (<u>Id.</u> at 2).  Further, the Justice noted that he previously had denied Covington's CPL § 330.30 motion to vacate to the extent it had raised the Dhuga issue, and that Covington had presented no new basis for the court to reach a contrary conclusion.  (<u>Id.</u>).

2.      <u>Covington's Appeal</u>

On June 22, 2005, the Appellate Division, First Department, granted Covington leave to appeal from the denial of his CPL § 440.10 motion, and consolidated that appeal with his direct appeal.  (<u>See</u> Ex. E).  The Center for Appellate Litigation then

filed an eighty-two page brief on appeal, which Covington supplemented with two <u>pro se</u> briefs of his own, each more than two hundred pages long.  (<u>See</u> Exs. F-H).

In the counseled brief, Covington contended, <u>inter alia</u>, that his conviction should be set aside because:  (a) the trial court deprived him of an impartial jury by failing to conduct a full inquiry into the purportedly improper juror conversations; (b) the trial court violated Covington's Sixth and Fourteenth Amendment rights by failing to grant Covington's request for new counsel; (c) Covington's trial counsel was ineffective; (d) the prosecutor's failure to instruct the grand jury with respect to alibi evidence "so impaired the integrity of the grand jury proceedings as to render the robbery and assault counts . . . fatally defective;" and (e) Covington's conviction under Section 158.40 of the New York Penal Law ("PL") relating to criminal possession of public benefit cards was unconstitutional because the statute presumes that a holder of five or more public benefit cards intended to commit fraud.  (Ex. F).

In the first of his <u>pro se</u> briefs, Covington supplemented his counsel's arguments as to points (b) through (e), and also raised two additional points.  First, Covington contended that he suffered "spillover prejudice due to ineffective assistance of counsel and prosecutorial misconduct."  (Ex. G).  This claim evidently was based on Mr. Fenstermaker's failure to move for dismissal of certain counts and comments made by the prosecutor during summation.  (<u>Id.</u>).  Second, Covington argued that Justice Bradley's pretrial suppression decisions were improper, and that Mr. Fenstermaker was ineffective at that stage.  (<u>Id.</u>).  In his second <u>pro se</u> brief, Covington repeated each of the claims

14

raised in his first pro se brief.  He also claimed that he had been denied the right to testify

on his own behalf in violation of the Sixth and Fourteenth Amendments to the United

States Constitution.  (Ex. H).

On October 23, 2007, the Appellate Division unanimously affirmed

Covington's judgment of conviction.  People v. Covington, 843 N.Y.S.2d 606 (1st Dep't

2007).  In its decision, the court first held that Justice Carruthers properly denied

Covington's motion to set aside the verdict because Covington's allegations of juror

misconduct were not supported by a sworn affidavit or affirmation and "hearsay

statements [would] not suffice."  Id. at 608.  The court noted further that the hearsay

evidence that Mr. Fenstermaker had presented failed to show that "the people allegedly

discussing the case were jurors instead of spectators."  Id.  Finally, the court observed that

"not every misstep by a juror rises to the inherently prejudicial level at which reversal is

required," and that Covington failed to demonstrate any misconduct that had "deprived

him of a fair trial."  Id. (quoting People v. Brown, 48 N.Y.2d 388, 394 (1979)).

Turning to Covington's Sixth Amendment claims, the court concluded that

Justice Carruthers had exercised his discretion appropriately in refusing to replace

Covington's trial counsel once the trial was underway.  Id.  The court further determined,

based on both state and federal law, that Mr. Fenstermaker was not ineffective.  Id.

Specifically, the court found that while the decision to call Dhuga as a witness had been

"risky," Covington approved the decision, which was appropriate "because the witness

could have reasonably been expected to provide valuable exculpatory testimony."  Id. at

15

608-09.  The court also noted that Justice Carruthers had negated any potential prejudice stemming from the decision to call Dhuga by giving a "thorough curative instruction." Id. at 609.

The court further opined, that the "grand jury proceedings were not unlawfully defective," and that the "possession of benefit cards conviction was not unconstitutionally obtained."  Id. at 609.

Finally, the court "considered and rejected," Covington's remaining claims, "including those contained in his pro se supplemental brief."  Id.

On October 30, 2007, Covington's appellate counsel sought leave to appeal this decision to the Court of Appeals on the basis of all of Covington's claims, including his pro se arguments.  (Ex. K).  On January 10, 2008, the Court of Appeals denied that application.  (Ex. L).

3.    Amended Motion to Vacate Judgment and Sentence

On November 6, 2007, Covington filed another pro se motion to vacate the judgment of conviction and to set aside his sentence pursuant to CPL §§ 440.10 and 440.20.  In this motion, Covington repeated the claims that he and his appellate counsel previously had raised, but he added one new issue:  Covington contended that the New York State Department of Correctional Services had improperly imposed a period of post-release supervision ("PRS") that was not part of the original sentence pronounced by the trial court.  (Ex. M).  On March 20, 2008, Justice Carruthers denied the motion.  In his decision, the Justice observed that every claim other than Covington's new sentencing

16

claim was procedurally barred.  (Ex. P at 3-4).  The Justice rejected the new claim on the theory that a period of PRS necessarily was included in the sentence by operation of law despite his prior failure to so indicate.  (Id. at 4 (citing People v. Lingle, 825 N.Y.S.2d 12 (1st Dep't 2006))).  On June 24, 2008, the Appellate Division denied Covington's application to appeal this decision.  (Ex. S).

### 4.    Motion to Reargue

On April 17, 2008, Covington moved to reargue his pro se CPL § 440 motion.  (Ex. T).  At this stage, Covington finally secured a victory.  Within days after the motion was filed, the New York Court of Appeals held in People v. Spaerber, 10 N.Y.3d 457, 469-70 (2008), that only a court, not the Department of Correctional Services, could pronounce a PRS term.[5]  Id. at 470.  The Court of Appeals also held, however, that a defendant's case could be remanded after his sentence was vacated so that the statutorily-required mandatory PRS term could be imposed by a court.  Id. at 472.  Although Justice Carruthers acknowledged that the court had not imposed Covington's PRS term, he nevertheless denied Covington's motion, but declined to impose a new PRS term.  (Ex. U).

After considerable procedural wrangling, (see Exs. V-DD), the Appellate Division eventually "assume[d] without deciding" that "an appeal from a judgment of resentence" was properly before it for review.  The court nevertheless declined to remand

---

[5]    Spaerber subsequently was superseded by statute on other grounds.  See People ex rel. Joseph II v. Superintendent of Southport Correctional Facility, 15 N.Y.3d 126 (2010).

the case because Justice Carruthers' failure to impose a PRS term had not prejudiced Covington.  (Ex. EE at 47).  Additionally, as the court observed, to the extent that Covington sought a remand so that he could seek a shorter jail term, the relief requested was precluded by People v. Lingle, 16 N.Y.3d 621 (2011).  (Id. at 47-48).  In that case, the New York Court of Appeals held that neither a trial nor an appellate court could reconsider the "incarceratory component" of a sentence while correcting a trial court's failure to incorporate a PRS term into its sentence.  Lingle, 16 N.Y.3d at 634-35.  Covington's application for leave to appeal this decision was denied on December 27, 2011.  (Ex. HH).

> E.   Habeas Petition

Covington's Petition is dated November 17, 2011 and was received by the Pro Se Office of the Court on December 1, 2011.  (ECF No. 1).  Judge Pauley then referred the matter to me to report and recommend.  (ECF No. 7).  Thereafter, the Respondent filed his opposition papers on April 30, 2012.  (ECF Nos. 16-17).  On May 23, 2012, the case was reassigned to Your Honor.  (ECF No. 21).  Covington submitted a handwritten reply letter on May 29, 2012.  (ECF No. 23 ("Pet'r's Reply")).

## II.   Discussion

> A.   Standard of Review

A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court.  Herrera v. Collins, 506 U.S. 390, 401 (1993).  Rather, a state prisoner seeking habeas relief under Section 2254 must show that he is "in custody in

violation of the Constitution or laws or treaties of the United States."  28 U.S.C.

§ 2254(a).  The petitioner bears the burden of proving, by a preponderance of the

evidence, that his rights have been violated.  Jones v. Vacco, 126 F.3d 408, 415 (2d Cir.

1997).

 Section 2254, as amended by the Antiterrorism and Effective Death Penalty

Act of 1996 (AEDPA), provides, in part, that:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless the
> adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or
> > involved an unreasonable application of, clearly
> > established [f]ederal law, as determined by the
> > Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (emphasis added).

 As the Second Circuit noted in Jones v. Stinson, 229 F.3d 112, 119 (2d Cir.

2000), the Supreme Court has "construed the amended statute so as to give independent

meaning to 'contrary [to]' and 'unreasonable.'"  "Under the 'contrary to' clause, a federal

habeas court may grant the writ if the state court arrives at a conclusion opposite to that

reached by [the Supreme] Court on a question of law or if the state court decides a case

differently than [the] Court has on a set of materially indistinguishable facts."  Williams

v. Taylor, 529 U.S. 362, 412-13 (2000).  Under the "unreasonable application" clause, a

federal habeas court "may grant the writ if the state court identifies the correct governing

legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts." Id. at 413. This standard does not require that reasonable jurists all would agree that the state court was wrong. Id. at 409-10. Rather, the standard "falls somewhere between 'merely erroneous' and 'unreasonable to all reasonable jurists.'" Jones, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

      The standard set forth in Section 2254(d)(1) is "difficult to meet" for at least two reasons. White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (quoting Metrish v. Lancaster, 133 S. Ct. 1781, 1786 (2013)). First, the term "clearly established Federal law" applies only to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." Id. (quoting Howes v. Fields, 132 S. Ct. 1181, 1187 (2012)). Second, because "an 'unreasonable application of' those holdings must be 'objectively unreasonable,' not merely wrong[,] even 'clear error' will not suffice." Id. (quoting Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003)). Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. (quoting Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011)) (internal quotation marks omitted).

      Section 2254(d)(2) further authorizes the federal courts to grant a habeas writ when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in

the State court proceeding."  28 U.S.C. § 2254(d)(2).  However, to the extent that a habeas petition challenges factual findings, Section 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct" and "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  Id. § 2254(e)(1).

Although Section 2254 imposes a highly deferential standard of review, it does not require blind deference to every state court decision.  "If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail."  Williams, 529 U.S. at 389.

B.      Merits of Covington's Claims

1.      Claims Related to the Suppression Hearing

Covington's first batch of arguments are based on the premise that his conviction should be set aside because the evidence used to convict him – specifically, the five public benefit cards and cell phone recovered from his person by P.O. Schmidt – should have been suppressed.  (Pet. 34).[6]

---

[6]      In presenting these arguments, Covington takes the opportunity, in a scattershot fashion, to address other perceived flaws with the pretrial suppression hearing.  (See e.g., Tr. 48-50).  The majority of these are framed in the context of an ineffective assistance of counsel claim.  See infra 34-36.  To the extent Covington contends that other constitutional violations occurred during the suppression hearing, my review of the record fails to disclose any colorable grounds for those claims other than those addressed in this Report and Recommendation.

This challenge cannot be considered in light of the Supreme Court's decision in Stone v. Powell, 428 U.S. 465 (1976).  Pursuant to Stone, federal habeas relief is not available when a petitioner claims that "evidence produced at trial was the result of an unconstitutional search and seizure, unless the state denied [him] an opportunity for full and fair litigation of the claim."  Grey v. Hoke, 933 F.2d 117, 121 (2d Cir. 1991).  Thus, a Fourth Amendment claim can be addressed on habeas review only when (a) the state has provided no corrective procedures to redress the alleged Fourth Amendment violations, or (b) there is a corrective mechanism, but the defendant was unable to use it because of an "unconscionable breakdown in the underlying process."  Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992) (citing Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977) (en banc)).

The State of New York has provided Covington the requisite corrective procedures through Section 710 of the CPL.  See Capellan, 975 F.2d at 70 n.1 ("[F]ederal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in [CPL § 710.10, et seq.,] as being facially adequate.") (quoting Holmes v. Scully, 706 F. Supp. 195, 201 (E.D.N.Y. 1989)) (internal quotation marks omitted).  Further, Covington has failed to demonstrate the sort of "unconscionable breakdown" of state procedure necessary to warrant habeas relief.  Capellan, 975 F.2d at 70 (citing Shaw v. Scully, 654 F. Supp. 859, 864 (S.D.N.Y. 1987)).

2.    Grand Jury Proceedings

Covington also complains about alleged defects in the grand jury

proceedings leading to his indictment.  (Pet. 172).  This claim fails for at least two

reasons.  First, the Supreme Court "has never held that federal concepts of a 'grand jury,'

binding on the federal courts under the Fifth Amendment, are obligatory for the States."

Alexander v. Louisiana, 405 U.S. 625, 633 (1972) (citing Hurtado v. California, 110 U.S.

516, 538 (1884)).  Accordingly, even if Covington were able to show that there was some

irregularity in the state grand jury proceedings, he would not have a federal constitutional

claim.  Second, because Covington was convicted after a jury trial, any error in the grand

jury proceedings clearly would have been harmless.  See United States v. Mechanik, 475

U.S. 66 (1986) (trial jury's guilty verdict establishes guilt beyond a reasonable doubt,

thereby rendering harmless any error that may have occurred before the grand jury).

3.    Mandatory Statutory Presumption

Covington further maintains that his conviction under PL § 158.40 violated

his rights under the Sixth and Fourteenth Amendments to the United States Constitution.

(Pet. 203-16).  The state statute in question makes it a crime to possess five or more

public benefit cards in "a name or names other than the person's own name . . . with

intent to defraud, deceive or injure another."  PL § 158.40.  A related provision of the

Penal Law gives rise to a rebuttable presumption that an individual possessing five or

more public benefit cards, "possess[es them] with intent to defraud, deceive or injure

another."  Id. § 158.00(2)(a).

23

Recognizing that a mandatory presumption would raise constitutional

concerns, (see Tr. 532-37), Justice Carruthers instructed the jury as follows:

> Now, members of the jury, the law states that a person who
> possesses five or more public benefit cards, not in his own
> name, is presumed to possess them with intent to defraud or
> deceive or injure another.  This is simply an inference that
> you are free to draw, should you find that the People have
> proven beyond a reasonable doubt that the defendant
> possessed five or more public benefit cards.  You are by no
> means required to draw this inference.  You may draw the
> inference only if you find, from the circumstances, that it
> would be appropriate for you to do so.  The fact that you may
> draw this inference in no way shifts any burden of proof to the
> defendant.

(Id. 733-34) (emphasis added).

This charge clearly instructed the jury that the presumption was permissive.

Covington nevertheless contends that by charging the jury in this fashion, the Justice

improperly amended the statute, which required an unconstitutional mandatory

presumption.  He further maintains that a "weight of the evidence analysis" shows that he

did not intend to defraud or injure anyone.  (Pet. 232).  Addressing these claims, the

Appellate Division noted only that "the possession of benefits cards conviction was not

unconstitutionally obtained."  Covington, 843 N.Y.S.2d at 609.

The Appellate Division's determination, while admittedly terse, is plainly

correct.  At the outset, it is an "elementary principle" that "the same statute may be in part

constitutional and in part unconstitutional, and that if the parts are wholly independent of

each other, that which is unconstitutional may stand while that which is unconstitutional

will be rejected." Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 502 (1985) (quoting Allen v. Louisiana, 103 U.S. 80, 83-84 (1881)).  It is difficult to posit a circumstance in which this principle would be more applicable than here.  Indeed, the presumption provision appears in an entirely different section of the Penal Law than the provision that criminalizes the possession of five or more public benefit cards with criminal intent.  The fact that the presumption provision may have given rise to an unconstitutional mandatory presumption therefore does not mean that the separate crime of possessing five or more public benefit cards unlawfully is also unconstitutional.

Moreover, the inference instruction actually given to the jury, read in the context of the entire charge as it must be, could not have shifted the burden to the defense since Justice Carruthers plainly stated that the People had to prove beyond a reasonable doubt that Covington (a) possessed five or more public benefit cards that were not in his name, and (b) did so "with the intent to defraud, deceive or injure another."  (Tr. 734-35).  Thus, the jury could not have convicted Covington unless it found both required elements of the crime established beyond a reasonable doubt.  For this reason, as the Appellate Division correctly concluded, Justice Carruthers' inference instruction did not violate Covington's constitutional rights.

Turning to Covington's weight of the evidence argument, (Pet. 232), it is clear that there is a difference between such a claim and a claim that the evidence is legally insufficient.  Both state and federal courts agree that a weight of the evidence claim presents purely a question of state law.  See, e.g., Minigan v. Donnelly, 01-CV-

0026A (VEB), 2007 WL 542137, at *13 (W.D.N.Y. Feb. 16, 2007) (citing People v.

Bleakley, 69 N.Y.2d 490, 495 (1987), report and rec. adopted, 01-CV-026, 2007 WL

981762 (W.D.N.Y. Mar. 30, 2007)).  For this reason, "courts in this Circuit consistently

have held that weight-of-the-evidence claims are not cognizable on federal habeas review

since such claims allege only an error of state law, for which habeas review is not

available."  Minigan, 2007 WL 542137, at *13 (citing Garrett v. Perlman, 438 F. Supp. 2d

467, 470 (S.D.N.Y. 2006); Douglas v. Portuondo, 232 F. Supp. 2d 106, 116 (S.D.N.Y.

2002); Correa v. Duncan, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001); and Soundiata v.

Artus, No. 04 Civ. 1412 (DAB) (KNF), 2007 WL 143061, at *5 (S.D.N.Y. Jan. 12,

2007)).

        Furthermore, even if Covington's claim were to be construed as a challenge

to the sufficiency of the evidence, it clearly would fail.  The jury was not required to

accept Covington's absurd explanation of how he came to possess five public benefit

cards at one time.  Instead, they were free to conclude, based on the testimony of several

victim witnesses, that it was Covington's practice to hold his borrowers' benefit cards as

collateral for his usurious loans.  (See e.g., Tr. 174-99, 226-99, 303-27, 349-62, 439-54).

From this, the jury also could reasonably infer that Covington possessed the cards that he

had on the date of his arrest in furtherance of his unlawful lending business.

        4.   Prosecutorial Misconduct

        Covington next contends that he was prejudiced by the prosecutor's

improper remarks during both his opening and his summation.  Such a claim of

prosecutorial misconduct requires a court to consider "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  See Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).  The issue is not simply whether the prosecutor's comments were "undesirable or even universally condemned."  Id. Accordingly, a mere showing of prosecutorial misconduct does not necessarily entitle a petitioner to habeas relief.  Bentley v. Scully, 41 F.3d 818, 824 (2d Cir. 1994).  Instead the petitioner must show that he "suffered actual prejudice because the prosecutor's comments . . . had a substantial and injurious effect or influence in determining the jury's verdict."  Id.  Thus, "a defendant asserting that a prosecutor's remarks warrant a new trial faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair trial."  United States v. Banki, 685 F.3d 99, 120 (2d Cir. 2012) (internal quotation marks omitted).  Covington has failed to meet this "heavy burden" here.

a.    <u>Opening</u>

Covington's objection to the prosecutor's opening statement relates to his description of the anticipated testimony of Donald Williams, one of the many victims the People intended to call as witnesses.  (Tr. 41-42).  As the prosecutor explained, Williams had borrowed ten dollars from Covington, expecting to repay twenty dollars, but ultimately was asked to remit one hundred dollars after his repayment was delayed.  An altercation then ensued during which Covington and two other people assaulted Williams,

27

causing him to lose two teeth.  (Id. at 42).  When he was called as a trial witness, however, Williams stated that he had AIDS-related dementia.  (Id. at 445).  He therefore was unable to recall many of his dealings with Covington and could not even recall having testified before the grand jury.  (Id. at 439-54).

"Many things might happen during the course of [a] trial which would prevent the presentation of all the evidence described in advance."  Frazier v. Cupp, 394 U.S. 731, 736 (1969).  For this reason, "not every variance between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given."  Id.

Here, the record suggests that the prosecutor had a good faith basis to believe that Williams would testify in the manner that he described during his opening, since Williams had done so previously when he appeared before the grand jury.  (See Tr. 445-49).  As a result of his condition, however, Williams was able to testify only that he had borrowed money from Covington and had paid back double the amount of the loans.  (Id. at 443).  Williams was unable to explain how he had lost certain of his teeth.  (Id. at 444, 53).  The limited value of Williams' testimony is perhaps best demonstrated by the fact that Covington's counsel chose not to cross-examine him.  Moreover, after Williams testified, the charges arising out of his dealings with Covington were dismissed.  (Id. at 474-76).

In these circumstances, Covington's argument is, at best, that the prosecutor said he would prove that Covington assaulted Williams, but did not.  In that regard,

28

Justice Carruthers instructed the jurors at the outset of the trial, and reminded them during the court's charge, that counsel's openings, closings, and arguments were not evidence. (Id. at 12-16, 579, 682-83). Since the jury must be presumed to have followed these instructions, Covington cannot establish that he suffered any prejudice from the prosecutor's remarks during his opening statement. See Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985) ("Absent . . . extraordinary situations . . . we adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions.").

             b.    <u>Summation</u>

       Covington also claims that the Government impermissibly vouched for Vinson's credibility during summation. The portion of the prosecutor's argument to which petitioner objects was as follows:

> Joseph Vinson has no reason to lie. Joseph Vinson is another person who, at his most desperate hour, was taken advantage of by the defendant, and his testimony is corroborated by all the other victims, by all the other people that were taken advantage of. And, most importantly, his testimony is corroborated by the fact that the defendant had Joseph Vinson's benefit card in his pocket when he was arrested. And, therefore, again, based on the evidence, I ask you to find the defendant guilty [on] both usury counts relating to Joseph Vinson, and I ask that you find the defendant guilty of first degree usury because clearly these loans were part of the defendant's ongoing business.

(Pet. 234-35 (citing Tr. 643)).

"It is well established that prosecutors may not 'vouch for their witnesses' truthfulness.'" <u>United States v. Carr</u>, 424 F.3d 213, 227 (2d Cir. 2005) (quoting <u>United States v. Modica</u>, 663 F.2d 1173, 1179 (2d Cir. 1981)).  A prosecutor engages in such improper vouching when he "suggest[s] to a jury that there is additional evidence, not introduced at trial but known to the prosecutor, that supports the witness's credibility." <u>United States v. Newton</u>, 369 F.3d 659, 681 (2d Cir. 2004).  The vice of vouching is that it "may induce the jury to trust the [prosecutor's] judgment rather than its own view of the evidence." <u>Id.</u> (quoting <u>United States v. Young</u>, 470 U.S. 1, 18-19 (1985)).

Here, the statements to which Covington objects were entirely proper.  In his remarks, the prosecutor did not suggest that he had any special knowledge or evidence not adduced at trial that would corroborate Vinson's credibility.  Rather, he simply directed the jurors to the evidence that was before them, and made permissible arguments based on that evidence, including his assertion that a victim witness, such as Vinson, would have no reason to implicate Covington unless he was in fact guilty.  This did not constitute vouching.

5.      <u>Juror Misconduct</u>

Covington's Petition does not appear to incorporate the juror misconduct claim that his counsel raised on direct appeal, but the Respondent addresses it in his opposition papers and Covington also discusses it in his reply.  (Resp't's Mem. at 32-34; Pet'r's Reply at 11).  I therefore will address the claim briefly as well.

Covington evidently contends that several jurors violated Justice Carruthers' instructions by discussing a witness's testimony before both sides had rested and the case was submitted to them.  (See Ex. I at 60).  As the Second Circuit has noted, however, "[a]bsent underline evidence to the contrary [courts] presume that jurors remain true to their oath and conscientiously observe the instructions and admonitions of the court." United States v. Rosario, 111 F.3d 293, 300 (2d Cir. 1997) (quoting United States v. Easter, 981 F.2d 1549, 1553 (10th Cir. 1992)) (emphasis added).

Covington's motion to set aside the verdict did not present Justice Carruthers with any proof of the alleged juror misconduct other than inadmissible hearsay.  Furthermore, as the Appellate Division noted, even Mr. Fenstermaker's hearsay averments did not explain how the Legal Aid attorney allegedly knew that the persons discussing the case were jurors rather than spectators.  Covington, 843 N.Y.S.2d at 608. For these reasons alone, it is clear that Justice Carruthers did not err by denying Covington's motions.

In any event, even if Covington were able to show the persons involved were jurors and that they were discussing trial testimony, Covington cannot establish that he was prejudiced.  Indeed, according to Mr. Fenstermaker, the Legal Aid attorney believed that the conversation she overheard took place at approximately 11 a.m. on May 5, 2004.  (See Tr. at 432, 464-73).  From the transcript, it appears that this was the approximate time that Dhuga was testifying.  (See id.).  If so, Covington at best has established that the jurors were discussing the testimony of a witness whose testimony

later was stricken.  The fact that they may have disparaged the witness then, was helpful, not harmful, to Covington.  Covington therefore could not have been prejudiced even if the conversation did occur.

> 6.    Ineffective Assistance of Counsel

Covington also voices a host of complaints about Mr. Fenstermaker's performance, alleging that he rendered ineffective assistance of counsel.  None of these assignments of error withstands scrutiny.

> a.    Applicable Law

To prevail on an ineffective assistance of counsel claim, a petitioner must demonstrate (a) that his counsel's performance "fell below an objective standard of reasonableness" and (b) that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 688-94.  With respect to the first of these requirements, there is a "strong presumption that [a lawyer's] conduct falls within the wide range of reasonable professional assistance."  Id. at 689.  This deference is due because "it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight."  Bell v. Cone, 535 U.S. 685, 702 (2002).  Therefore, a petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Id. (quoting Strickland, 466 U.S. at 689) (internal quotation marks omitted).

32

Although the <u>Strickland</u> test has two prongs, a court considering an ineffective assistance claim need not "address both components of the [<u>Strickland</u>] inquiry if the [petitioner] makes an insufficient showing on one." <u>Strickland</u>, 466 U.S. at 697.  Indeed, as the Supreme Court noted in <u>Strickland</u>, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." <u>Id.</u>

Here, of course, Covington advances his ineffectiveness claims through a habeas proceeding.  As the Supreme Court recently has reaffirmed, "[w]hen a state prisoner asks a federal court to set aside a sentence due to ineffective assistance of counsel," the court is required to "use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." <u>Burt v. Titlow</u>, 134 S. Ct. 10, 13 (2013) (quoting <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388, 1403 (2011)).  For this reason, it is scarcely surprising that "the great majority of habeas petitions that allege constitutionally ineffective counsel" fail.  <u>See</u> <u>Lindstadt v. Keane</u>, 239 F.3d 191, 199 (2d Cir. 2001).

         b.     <u>Application of Law to Facts</u>

         i.     <u>Suppression Hearing</u>

Covington first questions his counsel's performance during the pretrial suppression hearing.  Reviewing the hearing transcript with a fine tooth comb, Covington contends that Mr. Fenstermaker improperly conceded on two occasions that P.O. Schmidt had probable cause to arrest him.  (<u>See</u> Pet. 51, 55).

Covington first claims that Mr. Fenstermaker improperly conceded that his arrest at the precinct was lawful during his post-testimony remarks at the suppression hearing.  (Pet. 51).  Read in context, however, it is apparent that his counsel was arguing precisely the opposite when he made the statement (highlighted below) that Covington characterizes as a concession.  As Mr. Fenstermaker explained:

> Your Honor, with respect to the initial seizure of . . . Covington on August 26th, 2003 by [P.O.] Schmidt, I will argue that [P.O.] Schmidt did not have probable cause to arrest . . . Covington at that time.
>
> There was conflicting testimony from officers and the detective with respect to the nature of these wanted posters.
>
> It appears as though there is some confusion within the 24th Precinct as to how many types of wanted posters there are and the meaning of those wanted posters.
>
> [P.O.] Schmidt knows that the wanted poster in question he had on . . . Covington was a wanted poster for the purpose of arrest, and that that wanted poster is in fact backed up by probable cause.  Then the initial seizure of . . . Covington was illegal.

(H1. 111-12) (emphasis added).  The beginning of the final paragraph admittedly can be read to suggest that the arresting officer had probable cause. The very next sentence, however, urges the opposite conclusion.  It thus appears that the word "unless" is missing from the beginning of that paragraph.  Whether the omission of that word is an error in transcription or Mr. Fenstermaker misspoke, it is clear that this did not adversely affect Covington's case.  Indeed, Justice Bradley made no reference whatsoever to this supposedly pivotal concession in the course of concluding that the arresting officer had

34

"reason to believe that the defendant was wanted for a felony in view of that fact that there was a wanted poster placed by a detective of the detective squad of the precinct to which he was assigned." (Id. at 132-33).

Continuing his scorched earth approach, Covington also argues that his counsel was ineffective due to his phrasing of a single question posed to P.O. Schmidt during the suppression hearing. (Pet. 55). Mr. Fenstermaker asked the officer: "Other than your concerns about the five public benefit cards did you witness . . . Covington commit any other sort of offense in your presence then or at any other time?" (H1. 20) (emphasis added). P.O. Schmidt responded "No." (Id.). Covington contends that the phrasing of counsel's question conceded that there was probable cause to arrest him for some sort of offense related to the benefit cards, as well as his guilt, and also foreclosed his ability to defend on the theory that he had lawful temporary possession of the cards. (Pet. 55). Here again, however, Covington cannot show prejudice because the concessions that he believes were made do not appear to have played any role in Justice Bradley's decision. Indeed, P.O. Schmidt's negative response to the question laid the predicate for further questioning during which the officer admitted that he never asked Covington why he had the cards, did not know whether they were stolen, and had failed to investigate whether the card owners had provided them to Covington voluntarily. Thus, Mr. Fenstermaker used this question to advance precisely the argument that Covington himself urges: that P.O. Schmidt could not have had probable cause for an arrest based on the benefit cards because he had no knowledge as to whether they were

35

stolen.  (H1. 112-13).  The question to which Covington objects therefore did not prejudice him.[7]

Covington also questions his counsel's failure to object to Justice Bradley's decision to hold a <u>Wade</u> hearing, rather than a <u>Rodriguez</u> hearing, to ascertain the reliability of various pretrial identifications of him.  (Pet. 63-64); <u>see United States v. Wade</u>, 388 U.S. 218 (1967); <u>People v. Rodriguez</u>, 79 N.Y.2d 445 (1992).  A <u>Wade</u> hearing is held to determine whether an out-of-court identification of a defendant is "unduly suggestive" or has an "independent basis of reliability and is therefore admissible during the trial." <u>Maldonado v. Burge</u>, 697 F. Supp. 2d 516, 521 (S.D.N.Y. 2010); <u>Georgison v. Donelli</u>, No. 04 Civ. 1444 (DC), 2005 WL 1384015, at *1 n.2 (S.D.N.Y. June 9, 2005).  A <u>Rodriguez</u> hearing, on the other hand, is held when the People contend that a witness had "sufficient familiarity" with the defendant to make it irrelevant whether the identification procedure was unduly suggestive.  <u>Hankins v. Smith</u>, No. 03 Civ. 5404 (WHP) (KNF), 2008 WL 4601000, at *12 (S.D.N.Y. Oct. 15, 2008).  In other words, a <u>Rodriguez</u> hearing provides a mechanism for a prosecutor to convince the court that a <u>Wade</u> hearing is unnecessary.  <u>Id.</u>  Therefore, if Justice Bradley conducted a <u>Wade</u> hearing, rather than a <u>Rodriguez</u> hearing, Covington could not have been prejudiced by

---

[7]     As Covington accurately notes, Mr. Fenstermaker asked essentially the same question when he cross-examined P.O. Schmidt at trial.  (Pet. 55 (citing Tr. 378)).  Here again, however, Mr. Fenstermaker plainly was trying to suggest that if Covington's possession of the five benefit cards could be explained, there was no lawful basis for Covington's arrest.  For that reason, Mr. Fenstermaker's decision to ask the question at trial did not prejudice Covington's defense.

his counsel's failure to object to this alleged error because the prosecution consequently

was required to establish that the identification procedures were not unduly suggestive.

### ii.    Denial of Request for New Counsel

Covington next asserts that he was denied effective assistance of counsel

because the trial court rejected his and Mr. Fenstermaker's joint application, immediately

after the prosecutor's opening statement, to have the court appoint substitute counsel.

(See Ex. F at 48; Tr. 64-99).  Covington's principal reason for seeking a substitution of

counsel at that late stage was Mr. Fenstermaker's proposed trial strategy of conceding

guilt as to some charges in order to defend more credibly against other charges that

carried the highest potential jail sentences.  (Id. at 73-74).  Rejecting that strategy,

Covington demanded that Mr. Fenstermaker vigorously contest his guilt as to each

charge, apparently hoping that the People's seemingly strong case against him would

unravel.  (Id. at 75-76).

A substitution of counsel during or immediately prior to trial is warranted

only by a showing of "good cause, such as a conflict of interest, a complete breakdown of

communication or an irreconcilable conflict . . . ." McKee v. Harris, 649 F.2d 927, 931

(2d Cir. 1981).  Moreover, "[a]lthough the Sixth Amendment provides a criminal

defendant the right to the assistance of counsel, this right 'does not guarantee a

meaningful relationship between the defendant and his counsel.'" Haith v. Walsh, No. 08

Civ. 6753 (NRB), 2009 WL 2433747, at *5 (S.D.N.Y. July 30, 2009) (quoting United

States v. John Doe # 1, 272 F .3d 116, 122 (2d Cir. 2001) (internal quotation marks omitted)).

When the application was made, Justice Carruthers conducted a thorough inquiry into Covington's allegations of conflict and found no cause to appoint substitute counsel. (Tr. 99). Rather, Justice Carruthers determined that despite their disagreement over strategy, Covington was, in fact, able to communicate effectively with Mr. Fenstermaker, and that the relationship between them, though fractured, was reparable. (Id. at 99). Justice Carruthers further resolved the disagreement by instructing Mr. Fenstermaker not to give an opening statement that conceded Covington's guilt on any counts. (Id. at 96). This resolution was neither erroneous nor unreasonable and Mr. Fenstermaker's subsequent zealous advocacy of Covington at trial belies Covington's allegations of prejudice.[8]

### iii.   Decision to Call Dhuga

Covington also questions the decision to have Dhuga testify as a defense witness. (Pet. 146-71). As Mr. Fenstermaker readily conceded at trial, the decision to call Dhuga was a "risky" one. (Tr. 429, 502). Nonetheless, had he testified truthfully, Dhuga might have pinned the violent assault of Vest on a single assailant, thereby calling

---

[8]     To the extent Covington's voluminous submissions can be read to imply that Mr. Fenstermaker was laboring under an actual conflict of interest due to his prior or his wife's current employment as an assistant district attorney, he has failed to allege, much less substantiate, that Mr. Fenstermaker's "interests diverge[d] [from his] with respect to a material factual or legal issue or to a course of action," or that such a divergence "adversely affected counsel's performance."  LoCascio v. United States, 395 F.3d 51, 56 (2d Cir. 2005).

into question whether Vest's account of the assault was credible and whether Covington in fact was involved. In hindsight, of course, it is clear that the decision to have Dhuga testify was a mistake. Importantly, however, hindsight is not the perspective from which such a decision must be judged. See Strickland, 466 U.S. at 689 (noting that "every effort" must be made to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time"). Since the evidence of Covington's guilt was overwhelming, Mr. Fenstermaker reasonably could have concluded that the only way to secure an acquittal on the violent felony charges relating to Vest was to call Dhuga to establish that a single actor other than Covington was the person who had committed the assault. Indeed, Covington evidently agreed with this strategy. (See Tr. 429, 506). For these reasons, Covington cannot overcome the presumption that the decision to have Dhuga testify was sound trial strategy, even if it ultimately backfired. See Strickland, 466 U.S. at 689.

In any event, even if the decision to call Dhuga could be considered a departure from an objective standard of reasonableness, Covington cannot possibly show that he was prejudiced by this lapse in judgment. Soon after Dhuga testified, Justice Carruthers instructed the jury to disregard his testimony in its entirety. (Tr. 556-57). What Covington now dismisses as a "brief, belated and ambiguous curative instruction," (Pet. 33), actually was delivered to the jury the morning after Dhuga's testimony and was repeated in the court's final charge. (Tr. 556-57, 691). There also was nothing

39

ambiguous about the instructions, which were to "completely disregard" Dhuga's testimony.  (Id. at 556).  Justice Carruthers further emphasized the point by telling the jurors that they could "draw no inference unfavorable to the defense or the prosecution" from the instruction and could not "allow [Dhuga's] testimony to influence [them] in any way concerning any factual findings . . . or concerning any verdict."  (Id. at 557).

In the absence of evidence to the contrary, the jury must be presumed to have followed the court's emphatic instruction.  Blueford v. Arkansas, 132 S. Ct. 2044, 2051 (2012) (quoting Weeks v. Angelone, 528 U.S. 225, 234 (2000)).  Covington has presented no such evidence.  Indeed, despite the Dhuga episode, the jury acquitted Covington of several assault charges and the most serious robbery charge relating to Vest. (See Tr. 755-58).  Given that verdict, Covington plainly cannot establish that he was prejudiced by the decision to call Dhuga as a trial witness.

### iv.   Failure to Call or Impeach Other Witnesses

Covington further contends that Mr. Fenstermaker failed to impeach certain prosecution witnesses effectively.  (Pet. 139-45).  Much of his argument assumes that he was being held at Rikers Island on unrelated charges during the period that he was alleged to have committed the crimes with which he was charged and, therefore, could not have been guilty of those crimes.  (Id. at 140).  The springboard for this claim appears to be a passing criticism in his counseled brief on appeal, which noted that Mr. Fenstermaker failed to "impeach[] one of the usury complainants with information that [Covington] was not available to loan her money when she claimed."  (Ex. F at 66).

Covington has furnished the Court with documents from the New York City Department of Correction and the state courts which show that he was detained at Rikers Island on a parole violation and indictment from October 12, 2002, until March 11, 2003. (Pet'r's Ex. A).  Notably, Green was the only witness who testified about criminal conduct by Covington during this specific period.  According to Green, Covington loaned her money on approximately three occasions, including "the end of 2002 around December," the winter of 2003, and August of 2003.  (Tr. 310-13).  The only counts actually presented for the jury's consideration with respect to Green, however, related to loans allegedly made to her between December 1, 2002, and March 31, 2003 (Count 13), and between August 1 and 26, 2003 (Count 12).  (Id. at 731).  Since Covington could have made both of these loans despite his stay at Rikers Island, it is entirely understandable that Mr. Fenstermaker did not wish to reveal to the jury that the charges they would be considering were not Covington's sole involvement with the criminal justice system.

Covington also claims that Mr. Fenstermaker should have introduced into evidence a sworn affidavit, dated January 22, 2004, in which Green attested that she had never borrowed money from Covington, that she had never repaid any loans that he extended to her, that Covington had possessed her benefit card on the date of his arrest solely for "the purpose of returning it," and that the People's payment of ten dollars to her every time she came to court had influenced her prior testimony.  (Pet. 96-97; Pet'r's Ex. Z).  When Mr. Fenstermaker attempted to question Green about those statements,

however, she stated that she "was forced to sign" the affidavit at Brundage's request because she was "scared."  (Tr. 320).  Since Green confirmed key elements of the statement during her testimony despite that disclaimer, there was no reason for Mr. Fenstermaker to gild the lily by seeking to introduce it into evidence.

v.    <u>Failure to Call Additional Defense Witnesses</u>

Covington also complains about his counsel's failure to call as alibi witnesses Brundage, Collina Ware, Norman Branch, an "official from the New York City Department of Correction," Police Officer T. Arnold, and Sergeant Sheehan.  (Pet. 137-38).  Covington contends that certain of these individuals could have testified that he was incarcerated during the period that some of the crimes charged in the indictment allegedly occurred.  Others purportedly could have explained that he was in "temporary lawful possession" of the benefit cards on the date of his arrest.  (<u>Id.</u> at 138).

Calling witnesses to testify with respect to the first of these topics would have been no less damaging to Covington than establishing his whereabouts through Department of Correction records.  Furthermore, as noted previously, the proposed testimony about the duration of his stay at Rikers Island would not have provided an absolute defense to the crimes ultimately presented for the jury's consideration.  For these reasons, it was perfectly reasonable for Mr. Fenstermaker to decide not to reveal to the jury, through witness testimony, that Covington had spent time at Rikers Island on criminal charges.

42

Turning to the second proposed topic, several witnesses, including Brundage, apparently would have testified that Covington could not have assaulted Vest on August 22, 2003, because he spent the entire day and into the "wee hours of the morning" moving to a new apartment.  These witnesses also allegedly would have contradicted the police officers' version of how Covington came to be at the precinct, and they would have said that Brundage entrusted Covington with Green's benefit card so that he could return it to Green.  (Pet. 138; Pet'r's Exs. D-F).

Brundage, however, was Covington's fiancée and was herself implicated in the usurious lending scheme.  (See Tr. 108-09, 161-173, 459-60).  Moreover, as the prosecutor carefully explained to the jury during his summation, it seems highly unlikely that Brundage and Covington actually had spent the entire day together, as Brundage claimed, since their cellphone records showed that they telephoned each other no less than six times that day, while they supposedly were together.  (Id. at 668-69).[9]

As noted, Brundage apparently also would have testified that she gave Green's benefit card to Covington shortly before Covington was arrested.  The notion that Brundage had been keeping Green's benefit card for safekeeping, but happened to give it to Covington on the date of his arrest, was plainly absurd, however, in light of the number of witnesses who testified that Covington took their cards to secure their loans, and the fact that Covington had not one, but five such cards on his person when he was arrested.

_____

[9]        These cellphone calls also call into question the proposed testimony of Collina Ware, who evidently also was prepared to say that she spent the entire day with Covington while he was moving.  (See Pet'r's Ex. E).

The fact that Mr. Fenstermaker chose not to offend the jury by proffering a nonsensical explanation for Covington's possession of Green's card – only one of the five that he possessed at the time of his arrest – can hardly be considered objectively unreasonable. Indeed, had Brundage testified in the manner described in her affidavit, her testimony would have contradicted even Covington's own grand jury testimony, in which he stated that Brundage had given him <u>two</u> such cards on the night of his arrest. (<u>See</u> Ex. I at 27).

The sheer implausibility of Brundage's version of events evidently caused Mr. Fenstermaker to conclude that the testimony that she and others might have proffered as part of Covington's defense case would have been perjurious. (<u>See</u> Tr. 77-78). For the reasons set forth above, that was a reasonable conclusion for him to draw. Covington therefore cannot overcome the presumption that Mr. Fenstermaker's decision not to call these witnesses was a reasonable tactical decision. Moreover, even if that were not so, Covington cannot possibly show that he was prejudiced by the failure to call these witnesses, whose testimony likely would have been rejected by the jury as false.

vi.    Failure to Move to Dismiss<br>
<u>Counts of the  Indictment</u>

Covington next asserts that Mr. Fenstermaker was ineffective for failing to move to dismiss two Criminal Usury counts that arose out of his loans to Vinson. Covington advances two reasons that this motion should have been made:  first, that Vinson's testimony was "incredible as a matter of law;" second, that the evidence supporting the charges was legally insufficient since Vinson allegedly did not describe

44

any agreement between him and Covington with respect to the loan term or the applicable interest rate.  (Pet. 233-34).

The first of these claims proceeds on the premise that Vinson testified to having borrowed money on August 11 and 26, 2003, the same days that his benefits would have been credited to his account, thereby obviating any need for a loan.  Vinson testified, however, that the dates he provided to the jury for the loans were merely approximations.  (Tr. 355, 357).  In light of that testimony, Covington cannot show that the loans charged in the two counts could not have been made.

Turning to Covington's sufficiency argument, the People adduced extensive evidence regarding the nuts and bolts of the scheme.  Thus, numerous witnesses – including White, Green, Faison, and Williams – explained that the arrangement was that they would borrow money and repay twice the principal amount when their benefit payments were next credited to their accounts.  Given this consistent custom and practice, there was no need for the People to adduce additional testimony from Vinson regarding this issue when he testified.  In any event, Vinson <u>did</u> testify that he repaid double the amount that he had borrowed the first time that Covington extended a loan to him, and that he expected to do so the second time as well.  (<u>Id.</u> at 356-58).  Consequently, there was evidence regarding the interest rate applicable to Vinson's loans and no basis upon which Mr. Fenstermaker reasonably could have sought dismissal of those usury charges.

vi.     Failure to Request Limiting Instruction
Regarding Uncharged Crimes

Covington next claims that his attorney failed to request a limiting instruction regarding uncharged crimes.  (Pet. 235).  Mr. Fenstermaker did, however, make a motion in limine to preclude the use of such evidence.  (H1. 41-45).  As a result, the court limited the People to establishing the details of loans made during the time period covered by the indictment.  (Id.).

As noted previously, six of the counts presented for the jury's consideration charged Covington with Criminal Usury in the First Degree.  One element of that crime is that the defendant must either have "previously been convicted of the crime of criminal usury" or have been engaged in the conduct charged as "part of a scheme or business of making or collecting usurious loans."  PL § 190.42.  At trial, there was no suggestion that Covington had a prior criminal usury conviction.  Accordingly, the People had to prove that Covington was engaged in a scheme or business of making usurious loans. The People's proof of other contemporaneous usurious loans obviously was relevant to that issue and did not constitute evidence of "uncharged" crimes.  Mr. Fenstermaker consequently cannot be faulted for failing to request that the jury be given an uncharged crimes instruction.

vii.     Right to Testify

Finally, Covington claims that Mr. Fenstermaker prevented him from testifying on his own behalf.  (Pet. 80).  This claim evidently arises out of a statement that

Mr. Fenstermaker made to Justice Carruthers during his application to be replaced as Covington's counsel.  At that time, Mr. Fenstermaker asserted "I will not put on his defense, I will not put it on."  (Id. at 80-81 (citing Tr. 64)).  Covington interprets this statement as an expression of his counsel's "final decision that [he] would not testify." (Id. at 81).

A defendant in a criminal case has an absolute constitutional right to testify on his own behalf.  See Rock v. Arkansas, 483 U.S. 44, 49 (1987).  Here, however, Mr. Fenstermaker's statement related to a particular defense, not specifically who would testify.  Moreover, during the same colloquy that Covington cites to support his claim, Mr. Fenstermaker noted that Covington had indicated that "he might not testify at trial" if his grand jury testimony was read to the jury.  (Id. at 82).  Since the People introduced his grand jury minutes as part of their case, there was no reason for him to testify and expose his prior criminal record to the jury.

Moreover, after the People rested, Justice Carruthers specifically asked whether Covington "intended to testify."  Although Covington had been fairly vocal throughout the proceedings, (see, e.g., 78-80, 85-89), he did not utter so much as a syllable of protest when Mr. Fenstermaker stated that he did not wish to do so.  (See Tr. 492, 508).

In light of this record, it seems highly unlikely that Covington in fact wished to testify at trial.  In any event, even if that was his intent, the key elements of the testimony that he proposed to give were presented to the jury through his grand jury

testimony without exposing him to cross examination.  Since the trial jury convicted him despite having heard that defense, Covington cannot demonstrate that he was prejudiced by the alleged inability to take the stand.

   6. <u>Post-Release Supervision and Resentencing</u>

   Covington's last claim is that the Department of Correctional Services improperly added a PRS term to his sentence.  The Respondent counters that this claim should be dismissed as moot because Covington already has effectively been resentenced to his original prison term without PRS.

   Covington is correct that an administratively-imposed PRS term is, as a matter of law, improper.  <u>See</u> <u>Earley v. Murray</u>, 451 F.3d 71, 75 (2d Cir. 2006).  However, the remedy available in a habeas proceeding would, at best, be limited to an order excising the PRS term from his sentence.  <u>See</u> <u>id.</u> at 76-77; <u>Trapp v. Poole</u>, 9:07 Civ. 893 (GLS) (RFT), 2010 WL 3724879, at *1 (N.D.N.Y. Sept. 17, 2010).  Thereafter, the state courts would remain free to resentence him to the previously-neglected mandatory five-year PRS term.  <u>See</u> <u>Edwards v. New York</u>, No. 08 Civ. 0112 (RJS) (JCF), 2009 WL 4016412, at *2 (S.D.N.Y. Nov. 18, 2009).

   Here, the state courts have already afforded Covington more relief than was required since they did not remand his case for resentencing, and he consequently will not be subject to <u>any</u> term of PRS.  Inasmuch as he has received all the relief to which he is entitled, his sentencing claim is moot.

III.    Conclusion

   For the foregoing reasons, Covington's habeas petition should be denied. Furthermore, because Covington has not made the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2), a certificate of appealability should not issue.

IV.    Notice of Procedure for Filing of Objections to this Report and Recommendation

   The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Analisa Torres and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Torres. The failure to file these timely objections will result in a waiver of those objections for

purposes of appeal.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas

v. Arn, 474 U.S. 140 (1985).

        SO ORDERED.

Dated:      New York, New York
           December 8, 2014

                         FRANK MAAS
                 United States Magistrate Judge

Copies to:

Ronnie Covington
DIN # 04-A-3883
Five Points Correctional Facility
State Route 96
Post Office Box 119
Romulus, New York 14541

Respondent's Counsel via ECF